```
 1                  UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MAINE

 3     _____

 4     UNITED STATES OF AMERICA,            CRIMINAL ACTION

 5              Plaintiff              Docket No:  2:19-165-NT

 6

 7         -versus-

 8                                          TESTIMONY OF

 9     RICHARD FORTIER,                     ADAM SCHMIDT

10              Defendant

11     _____
                       Transcript of Proceedings
12

13     Pursuant to notice, the above-entitled matter came on for
       Continued Preliminary Hearing and Detention Hearing held
14     before THE HONORABLE NANCY TORRESEN, United States District
       Court Judge, in the United States District Court, Edward T.
15     Gignoux Courthouse, 156 Federal Street, Portland, Maine, on
       the 19th day of August 2019 at 10:02 a.m. as follows:

16

17     Appearances:

18     For the Government:  Nicholas M. Scott, Esquire
                            Assistant United States Attorney
19
       For the Defendant:  J. Hilary Billings, Esquire
20
       Also Present:  Sharon Reinheimer, U.S. Probation
21

22
                       Lori D. Dunbar, RMR, CRR
23                     Official Court Reporter

24                  (Prepared from manual stenography and
                    computer aided transcription)
25
```

```
 1              (Open court.  Defendant present.)

 2         THE COURT:  All right, good morning.  This is United

 3    States versus Richard Fortier, Docket No. 2:19-MJ-246-JHR.

 4    Nicholas Scott here on behalf of the Government, Hilary

 5    Billings here on behalf of Mr. Fortier.  We began this hearing

 6    on Friday.  I was hoping to see some more evidence from the

 7    Government.  Mr. Scott, do you have anything more?

 8         MR. SCOTT:  Your Honor, I have Corporal Adam Schmidt

 9    from the Maine State Police here to offer testimony.

10         THE COURT:  Okay.  Would you call him, please?

11         MR. SCOTT:  Yes, Your Honor.

12         THE CLERK:  Please raise your right hand.  Do you

13    solemnly swear that the testimony you shall give in the cause

14    now in hearing shall be the truth, the whole truth, and

15    nothing but the truth, so help you God?

16         THE WITNESS:  I do.

17         THE CLERK:  Please be seated.  Pull yourself right

18    up to the microphone.  Please state and spell your name for

19    the record.

20         THE WITNESS:  Adam Schmidt, A-D-A-M, S-C-H-M-I-D-T.

21         THE COURT:  Go ahead, Mr. Scott.

22         MR. SCOTT:  Thank you, Your Honor.  I wonder if I

23    might have the exhibits that were entered?

24         THE COURT:  Oh, yes.

25                         DIRECT EXAMINATION
```

1    BY MR. SCOTT:

2    Q.     Good morning, Corporal Schmidt.

3    A.     Good morning.

4    Q.     How are you employed?

5    A.     With the Maine State Police.

6    Q.     How long have you been employed by the Maine State

7    Police?

8    A.     Since August 6, 2012.

9    Q.     And did you have any prior law -- prior experience in

10   law enforcement before that?

11   A.     Yes, prior to that I worked a little over a year as a

12   reserve police officer with the York, Maine, Police

13   Department.

14   Q.     And during the course of your law enforcement career

15   have you had the occasion to receive training with regards to

16   the identification of controlled substances, including

17   methamphetamine?

18   A.     I have.

19   Q.     And have you also received training regarding common

20   methods of packaging methamphetamine as well as common methods

21   of distribution of methamphetamine?

22   A.     I have.

23   Q.     Now, Corporal Schmidt, during your career have you had

24   occasion to arrest persons who were in possession of what was

25   later determined to be methamphetamine by laboratory analysis?

1    A.    I have.

2    Q.    And did you have occasion to debrief some of those

3    individuals?

4    A.    Yes.

5    Q.    And through your debriefing those individuals, did you

6    learn that some of those individuals were users of

7    methamphetamine?

8    A.    That's correct.

9    Q.    And through your debriefing of some of the individuals

10   that were arrested -- that you arrested for possession of

11   methamphetamine, did you ever learn that some of those

12   individuals were distributors or dealers of methamphetamine?

13   A.    I have.

14   Q.    So based on that -- those experiences, would you say

15   that you are familiar with quantities of methamphetamine for

16   use and quantities of methamphetamine for distribution?

17   A.    Yes.

18   Q.    Have you also had occasion to interview individuals

19   that you've arrested regarding the price of -- or the general

20   range of prices of methamphetamine in Maine?

21   A.    I have.

22   Q.    All right.  Now, Corporal Schmidt, I'm going to bring

23   you the exhibits, Government Exhibit 1 and 2.  With the

24   Court's permission --

25              MR. SCOTT:  May I approach the witness?

1           THE COURT:  Sure.

2           MR. SCOTT:  Thank you.

3   BY MR. SCOTT:

4   Q.     I'm specifically going to ask you to look at Exhibit 2.

5   Can you just tell us what Exhibit 2 is?

6   A.     It's a photograph of some of the evidence that we

7   seized during the course of this investigation.

8   Q.     Okay.  Now, let me just back up a bit.  I'm going to

9   direct your attention to May 15th of 2019.  Did you have

10  occasion on that date to be involved of an individual that you

11  ultimately learned was Richard Fortier?

12  A.     That's correct.

13  Q.     And do you see that individual in the courtroom today?

14  A.     I do.

15  Q.     And where is he?

16  A.     He's sitting right there.

17  Q.     And can you just describe an article of clothing that

18  he's wearing?

19  A.     He's wearing a tan-colored shirt.

20          MR. SCOTT:  With the Court's permission I'll ask

21  that the record reflect that the witness has identified the

22  defendant.

23          THE COURT:  Um-hum, the record so reflects.

24  Q.     Now, on the date that the defendant was arrested, did

25  you seize any property?

1    A.    I did.

2    Q.    Did you take a photograph of that property?

3    A.    Yes.

4    Q.    Is that photograph that is Government's Exhibit 2, does

5    that fairly and accurately reflect items that you recovered

6    during the arrest of Mr. Fortier?

7    A.    It does.

8    Q.    And can you just hold that exhibit up so that the Court

9    and the parties can see?  And can you just point to the item

10   that's in the middle of the -- what appears to be a blue piece

11   of paper depicted in the photograph?  And can you explain to

12   the Court what that is?

13   A.    That is an evidence bag that contains crystal

14   methamphetamine.

15   Q.    Okay.  And from where did you recover that crystal

16   methamphetamine?

17   A.    A backpack that Richard Fortier was wearing.

18   Q.    And specifically can you describe how that crystal meth

19   was packaged?

20   A.    It was packaged inside of a gray style sunglass case

21   and primarily in two plastic Ziploc bags.

22   Q.    Okay.  And are those -- is that type of Ziploc bag a

23   method of packaging commonly used to package controlled

24   substances?

25   A.    In my experience, yes.

1    Q.    Okay.  Now, did there come a time that you weighed

2    those substances?

3    A.    Yes.

4    Q.    Can you just describe how you weighed those substances?

5    A.    Yes, the items which are contained inside of a sealed

6    evidence bag were placed on a scale.

7    Q.    Okay.  And just to be clear, were the items weighed

8    inside of the evidence bag?

9    A.    Yes.

10   Q.    Okay.  Now, what was the weight that you determined

11   from that weighing?

12   A.    The total bag weight was 25 grams.

13   Q.    Okay.  And did there come a time that you performed any

14   tests on the substances contained in those two bags?

15   A.    I did.

16   Q.    And what were the results of that test?

17   A.    I utilized a TruNarc testing device to establish a

18   presumptive positive, and the results showed a presumptive

19   positive for methamphetamine.

20   Q.    And can you just describe what a TruNarc device is?

21   A.    It's an implement that uses laser technology to scan

22   and analyze compounds so the -- you scan through the plastic

23   bag for safety reasons of this item, and it reads back with a

24   result of what it's able to identify.

25   Q.    Okay.  And just upon your visual inspection of those

1    items in the plastic bags that were identified as crystal

2    methamphetamine, based on your training and experience, are

3    those items -- is the size of those items and the quantity of

4    those items consistent with further distribution or with

5    personal use?

6    A.    Based on my experience this is more than a personal use

7    type amount that I would find on a general person.

8    Q.    Okay.  Previously you indicated that you had debriefed

9    persons who had indicated to you that they were users of

10   methamphetamine; is that correct?

11   A.    I have, yes.

12   Q.    And based on your debriefing of those individuals, do

13   you have any understanding of the general quantities that a

14   user of methamphetamine uses?

15   A.    Yes, I mean, like with any type of drugs, intolerance

16   that establishes over time, things can vary a slight bit.

17   Crystal meth especially I know based on my experience is

18   pretty strong and potent, and individuals that I've spoken to

19   have told me they've taken as little as a tenth of a gram that

20   will keep them high for over a 24-hour period.

21   Q.    Okay.  And in terms of the quantities of crystal

22   methamphetamine that you've previously recovered from

23   individuals who were users of methamphetamine, what range of

24   quantities are you generally recovering from users?

25   A.    Right from my usual interaction with users, anywhere

1   from small amounts, such as a tenth of a gram, to half gram to

2   a gram.

3   Q.    And are you familiar based on your debriefing of

4   individuals in your law enforcement career with the

5   approximate range of price per gram for crystal meth in Maine?

6   A.    Yes, it does vary based upon the supply and demand

7   market.  But I've heard prices ranging from $50 to -- a gram

8   to a hundred dollars a gram.

9   Q.    Okay.  And just to be clear, in your opinion as a law

10   enforcement officer with training and experience, are the

11   items that are contained in the two bags of crystal meth, are

12   they consistent with further distribution or with personal

13   use?

14   A.    Based on my experience, further distribution.

15   Q.    Okay.

16          MR. SCOTT:  Thank you, I have no further questions.

17          THE COURT:  Cross-examination?

18                      CROSS-EXAMINATION

19   BY MR. BILLINGS:

20   Q.    So if you could refer to Exhibit 2 again, please,

21   Officer Schmidt.  Do you have that with you?

22   A.    I do.

23   Q.    And would you point out, as you did before, but now a

24   different item.  In the lower right part of the picture, off

25   to the -- right next to the A in Troop A, do you see that

1    item?

2    A.    There is several items in that general facility --

3    vicinity.  Which one are you talking about in particular?

4    Q.    I'm talking about the one that's just to the right of

5    the letter A, right off to the side of that blue centerpiece.

6    A.    Yes.

7    Q.    Could you hold it up and point that out to the Court?

8    And what is that item?

9    A.    What is that item?  Those are bags.

10    Q.    That's a bag with something like a white powder

11    contained inside it; is that right?

12    A.    The picture is the -- the quality here is kind of

13    pixilated.

14    Q.    Well, do you know what that -- what's in that item?

15    What's the powder that's inside that little plastic envelope?

16    A.    I'd have to get a better quality picture so I could

17    identify the bag and then reference my report just to make

18    sure.

19    Q.    Isn't that the methamphetamine that was in that bag?

20    A.    In what bag?

21    Q.    The item I just had you point out, isn't that the

22    methamphetamine?

23    A.    These all items were contained within the backpack.

24    The methamphetamine we were referencing earlier was the

25    methamphetamine that was in the center of the picture here.

1    Q.    So is there any more than one item that you are aware

2    of that was methamphetamine in this bag?

3    A.    Not that I was able to get back on a test at this

4    point.

5    Q.    Okay.  So how do you -- why are you certain that the

6    item I had you point out isn't the one that's the

7    methamphetamine and the one that you pointed out that's in the

8    center of the Troop A mat, what is it that makes you certain

9    that that's the methamphetamine as opposed to the one I had

10   you point out?

11   A.    All of these items were contained in the backpack.  The

12   test that I got back showing a presumptive positive for

13   methamphetamine is the item that I pointed out in the center

14   of the blue piece of paper here with the Troop A.

15   Q.    And you're suggesting that those two plastic bags and

16   the items contained in them, the ones that are in the center

17   of the Troop A, that that total bag weight was 25 grams?

18   A.    Yes.

19   Q.    You're not at all including the weight from the glasses

20   case that they were found in; are you?

21   A.    No.

22   Q.    So -- and you're aware that there's going to be a

23   readout from the lab showing the actual true weight of the

24   methamphetamine.

25   A.    Yes, and that's exactly why the reason I cite in my

1   report that that's the total bag weight.

2   Q.    Okay.  Do you know what the true weight is of the

3   methamphetamine?

4   A.    I do not.

5   Q.    Do you know what the weight of the bags are?

6   A.    I do not.

7   Q.    And there were two of these bags?

8   A.    There was multiple bags, as you can see in the picture,

9   that were in the backpack.  The crystal methamphetamine was

10  contained within the gray style sunglass case and the two

11  Ziploc bags, along with some remnants that was also in the

12  sunglass case.

13  Q.    So you're not suggesting the methamphetamine was

14  25 grams; is that right?

15  A.    Yes, it's the total bag weight of the items that I

16  placed on the scale.  It gives me a digital readout, and

17  that's 25 grams, as I referenced in my report.

18  Q.    And you would agree that the weight of the

19  methamphetamine would necessarily have to be lower than

20  25 grams.

21  A.    That's correct.

22  Q.    And you're saying to the Court that you don't know how

23  much lower; is that right?

24  A.    That's correct.

25  Q.    Just the weight of these bags.

1    A.    That's correct.

2    Q.    And you're certain that the item you pointed out is the

3    one that's the methamphetamine and not the one that I pointed

4    out to you.

5    A.    As far as I know right now based on the test results we

6    were able to get back, the items are currently at the lab

7    awaiting analysis.  The only ones I was able to get a

8    presumptive positive test back are the methamphetamine that is

9    exhibited in the center of this picture, along with a small

10   amount of cocaine hydrochloride.

11   Q.    Is that demonstrated in this picture?

12   A.    The cocaine hydrochloride?

13   Q.    Yes.

14   A.    I would have to get a better quality picture to confirm

15   that.

16   Q.    Well, why is it you're sure from this picture, if it's

17   not sufficient quality, that the item that I pointed out to

18   you is the -- is the methamphetamine that you tested, as

19   opposed to the one that you pointed out to us that's in the

20   center of the Troop A mat?

21   A.    I personally tested the items in the center of the

22   picture with the TruNarc device, and that came back as a

23   presumptive positive for methamphetamine.

24   Q.    And when was that test done?

25   A.    There should be a TruNarc scan that was provided with

1  the case report that would provide that date and time

2  information.

3  Q.    Would you look to the end of your case report that's

4  Exhibit 1 that should be in front of you?  Would you look on

5  Page 4 of 5?

6  A.    Yes, on Page 4.

7  Q.    Okay.  Now, without having read that, were you

8  suggesting to us you didn't remember exactly when it was that

9  you did the TruNarc test?

10  A.    That's correct.

11  Q.    And looking at your report, does that refresh your

12  recollection about when you did it?

13  A.    It does.

14  Q.    And when was it?

15  A.    May 16th.

16  Q.    That would have been the day after the arrest; is that

17  right?

18  A.    That's correct.

19  Q.    Is there any reason why that wasn't done at the scene?

20        MR. SCOTT:  Objection.

21  Q.    Analyze what it is that was in the glassine bag before

22  the arrest was made?

23        THE COURT:  The objection?

24        MR. SCOTT:  As to relevance to this -- the scope of

25  this proceeding, which is --

1          THE COURT:  Overruled.  Go ahead and answer.

2     A.    The TruNarc devices, they -- we do not have them issued

3     personally to us.  They are kept at different locations

4     because we only have so many of them.

5     BY MR. BILLINGS:

6     Q.    Did you have any field testing equipment?

7     A.    I did not.

8     Q.    You didn't have anything like that with you for any of

9     these substances?

10    A.    Not with me, no.

11    Q.    Okay.  So the arrest was made before you identified

12    what was in the bag.

13    A.    Based on my training, education, and experience, I've

14    seen numerous amounts of crystal methamphetamine, and based on

15    my experience that item resembled crystal methamphetamine.

16    Q.    So if I ask you if the arrest was done before any

17    testing of the substances occurred, you'd have to say yes to

18    that; is that right?

19    A.    That's correct.

20    Q.    Would you agree that three grams would be consistent

21    with personal use?

22    A.    Three grams?

23    Q.    Yes.

24    A.    It depends on what type of drug you're talking about.

25    Q.    Methamphetamine.

1    A.    A habit that the person has.  It varies.

2    Q.    Right.  Let's say you have somebody who has a tolerance

3    for methamphetamine based on use over time and they had three

4    grams on their person.  Would that be consistent with their

5    personal use?

6    A.    Based on my experience in dealing with users of

7    methamphetamine, that would exceed the amount that I usually

8    see on people for personal use amount.

9    Q.    Really, even when you testified that a gram could cost

10   as low as $50, so $150 worth of a drug is not consistent with

11   personal use; is that what you're testifying to?

12   A.    It varies.  I'm just telling you what my experience is.

13   Q.    So you've never had somebody who you characterize as a

14   user who had a gram and a half on their person?

15   A.    I don't recall the exact amounts of everyone that I've

16   gotten with methamphetamine.  I just know that --

17   Q.    So, then, there could have been somebody with three?

18   A.    With three?

19   Q.    Yeah.

20   A.    I don't --

21   Q.    You testified that you don't recall the amounts of the

22   people who you characterize as users.

23   A.    I'm just explaining to you my experience that the users

24   that I have dealt with typically have a small quantity of, you

25   know, a tenth of a gram to a gram if they're just using.

1    Often times I find out when there's more than that that

2    they're giving some to somebody else and so on and so forth.

3    Q.    Somebody couldn't spend 150 bucks to supply themselves

4    with enough to use over a day or two?

5    A.    They could.

6    Q.    Have you ever talked to some experienced users who have

7    used up to half a gram?

8    A.    I have.

9    Q.    Point 75 grams?

10   A.    Yes, usually that lasts them several days.

11   Q.    Or even in a day?

12   A.    Typically no.

13   Q.    But there are some?

14   A.    I'm sure.

15   Q.    Okay.

16        MR. BILLINGS:  Nothing further, Your Honor.

17        THE COURT:  Any redirect?

18        MR. SCOTT:  Just briefly.

19                    REDIRECT EXAMINATION

20   BY MR. SCOTT:

21   Q.    Corporal Schmidt, just to direct you to May 15th of

22   2019, at the approximate time that this occurrence took place

23   where Mr. Fortier was arrested, that occurred in the late

24   evening at approximately -- after 10:00 o'clock p.m.; is that

25   correct?

1    A.      That's correct.

2    Q.      So would it be fair to say that there wasn't that much

3    time left in May 15th of 2019 after all of this occurrence had

4    taken place to actually test the items?

5    A.      That's correct.

6                MR. SCOTT:  Okay, thank you.

7                THE COURT:  Any recross?

8                MR. BILLINGS:  No, Your Honor.

9                THE COURT:  All right, I just have one question, if

10   you fellows don't mind.

11        So I thought I heard you say that that TruNarc detector

12   is something that is done through the plastic bag?

13                THE WITNESS:  Yeah, it's actually a really neat

14   device.  And the reason why we like it is just because we

15   don't have to expose ourselves to the substance.  So

16   substances such as cocaine, methamphetamine, and there are

17   some others you're actually able to test straight through a

18   plastic bag, so you don't have to come in contact with the

19   substance that you're testing.

20                THE COURT:  So it just doesn't make any sense to me.

21   How does it do it?  Does it -- just by the look of something?

22                THE WITNESS:  So what it does is it uses a laser

23   technology to read different types of chemical compounds.  So

24   we utilize a method, what's called like a direct scan method.

25   We'll take the device, establish a self-test to make sure it's

1    working properly, and then we'll directly place the laser on

2    top of the plastic bag and it will scan through the plastic

3    bag.  So you'd have the plastic bag as like a median in

4    between the device and the substance, and it will scan that

5    device for a certain amount of time to read its chemical

6    makeup.  And then it will analyze that result and come up

7    with, you know, what it identified it as right on the screen

8    in real time.

9              THE COURT:  That's amazing.  All right, thank you.

10             THE WITNESS:  You're welcome.

11             THE COURT:  I didn't know that.  Learn something new

12   every day.

13        Anybody want to follow up on that questioning?

14             MR. SCOTT:  No, Your Honor.

15             MR. BILLINGS:  Just a couple.

16                       RECROSS-EXAMINATION

17   BY MR. BILLINGS:

18   Q.    Have you had experience with any false positives with

19   the TruNarc test?

20   A.    No, the typical problems that we run into with it is

21   items that contain like heroin or fentanyl that refract the

22   laser, sometimes you'll get an inconclusive response based on

23   that.  But the results that I have with the device, I

24   personally have not come up with a false positive.

25             MR. BILLINGS:  Okay, nothing further.

1          THE COURT:  All set?

2          MR. SCOTT:  Yes, Your Honor.

3          THE COURT:  Thank you for coming this morning.

4          THE WITNESS:  Thank you.

5               (Time noted:  10:25 a.m.)

6                    *   *   *   *   *

7                **C E R T I F I C A T I O N**

8    I, Lori D. Dunbar, Registered Merit Reporter, Certified

9    Realtime Reporter, and Official Court Reporter for the United

10   States District Court, District of Maine, certify that the

11   foregoing is a correct transcript from the record of

12   proceedings in the above-entitled matter.

13   Dated:  December 4, 2019

14              /s/ Lori D. Dunbar

15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25