# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Docket No. 2:19-cr-00165-NT |
| | ) | |
| RICHARD FORTIER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Richard Fortier is charged with possession of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm as a felon, in violation of 18 U.S.C. §§ 922(g)(1)[1] and 924(a). Before me is the Defendant's motion to suppress all evidence seized or secured by police officers on May 15, 2019, at a property in Lebanon, Maine. Mot. to Suppress Evid. (ECF No. 30). I held a two-day, video-conference hearing on the Defendant's motion on January 28, 2021, and February 16, 2021.[2] For the reasons set forth below, I **GRANT** the Defendant's motion to suppress.

---

[1]    The Indictment identifies Count Two as a "violation of Title 18, United States Code, Section 924(g)(1) and 924(a)" but later refers to Count Two as containing an "offense in violation of 18 U.S.C. § 922(g)(1)." Indictment 2 (ECF No. 20). The Synopsis lists Count Two as "Felon in Possession of Firearms. 18 U.S.C. §§ 922(g)(1) and 924(a)." Synopsis 1 (ECF No. 21). I presume that the reference to § 924(g)(1) in the Indictment was in error.

[2]    A hearing on this motion was originally scheduled for March of 2020 but was delayed due to the COVID-19 pandemic.

## BACKGROUND

The events at the heart of this motion occurred at a property on Heath Road in Lebanon, Maine ("**Heath Road Property**"), on May 15, 2019. At approximately 10:17 p.m. that evening, four Maine State Police officers—Corporal Adam Schmidt and Troopers Ryan Dubois, Conner Walton, and Benjamin Handzel—arrived at the Heath Road Property purportedly to conduct a bail check on Timothy James. Mr. James was under bail conditions for a state drug charge. As part of his bail conditions for that charge, he had agreed to submit to searches of his person, vehicle, and residence at any time without suspicion or probable cause to assess whether he was complying with a prohibition on possessing or using illegal drugs. Bail Conditions Form, at 2 (ECF No. 42-1).

Although Mr. James's bail condition form listed a property in Epsom, New Hampshire, as his residence, Corporal Schmidt testified that, based on two prior encounters with Mr. James in 2018, he believed Mr. James might be at the Heath Road Property on the night of May 15, 2019. The first encounter occurred in May of 2018, when Corporal Schmidt and another officer responded to a call that multiple individuals had removed a shed from a nearby property and were dragging it along the road towards the Heath Road Property. Mr. James told the officers that he had permission to take the shed, which he intended to live in while he built a home at the Heath Road Property. Officers determined, however, that the property from which the shed had been removed was under foreclosure and that the bank had not granted its permission to remove the shed. Mr. James was arrested and charged with

felonious theft by unauthorized taking. That charge was ultimately dismissed, and Mr. James pleaded guilty to a misdemeanor theft charge.

The second incident occurred in June of 2018 and involved the drug charges underlying Mr. James's bail conditions. Officers received a complaint from someone who heard a commotion at the Heath Road Property. Corporal Schmidt testified that officers responded and saw Mr. James and another individual exit a camper on the property. Mr. James let Corporal Schmidt look inside the camper to see if anyone else was present, and when he did so, Corporal Schmidt observed bags with the corners ripped, a pipe, a scale, an indeterminate substance, and "some Suboxone type pills." After a back-and-forth discussion, Mr. James signed a consent form authorizing officers to search the camper. Officers ultimately seized roughly ¼ of a gram of cocaine base and less than ½ of a gram of fentanyl. Corporal Schmidt summonsed Mr. James for drug trafficking, but the District Attorney's office charged Mr. James instead with unlawful possession of fentanyl powder (Class C), unlawful possession of scheduled drugs (Class D), and criminal forfeiture of property. In November of 2019, Mr. James ultimately pleaded guilty to the misdemeanor count of unlawful possession of scheduled drugs and consented to the criminal forfeiture. At sentencing, he was given a $400 fine and assessed $100 in fees.

Based on those two encounters—from May and June of 2018—Corporal Schmidt and three other officers decided to conduct a nighttime bail check of Mr. James at the Heath Road Property in May of 2019. Before they went to the property, the officers made no attempt to determine whether Mr. James was at the New

Hampshire residence identified in his bail conditions, and they had received no tips that Mr. James was at the Heath Road Property or was violating any of his bail conditions. Corporal Schmidt testified that he had previously gone to the Heath Road Property a couple of times to conduct bail checks on Mr. James but that he had never seen Mr. James or made contact with anyone there. And when asked at the hearing, Corporal Schmidt acknowledged that he "had no knowledge that Tim James would be on the property" on the night in question.

The Heath Road Property is located in rural Maine. The property is wooded and contains a clearing, which is entirely obscured from the main road by trees. Access to the clearing is down a 100-yard, rudimentary dirt path.[3] At least one "Keep Out" sign was present in 2018, and several "No Trespassing" signs were visible on trees along the path and on the camper itself in January of 2020.[4] According to John Fanning—a private investigator hired by the defense—Mr. James stated that the Defendant was helping him to clear trees in the area where he hoped to build a house.[5] Mr. Fanning testified that Mr. James told him that the Defendant would stay at the property periodically, including for as long as two weeks.

---

[3]     When the officers were at the Heath Road Property in June of 2018, they were able to drive a cruiser down the path to the clearing. However, on May 15, 2019, officers determined that the path was likely inaccessible by their vehicles due to mud. John Fanning—a defense investigator—described the access path as "not a road" and "not a driveway" but as a "wide pathway"—a "place where you can drive a vehicle into if it's not overly muddy."

[4]     Corporal Schmidt could not recall if the "No Trespassing" sign appeared on the camper on May 15, 2019. However, based on the evidence of signage in 2018 and 2020, I infer that at least one sign was present at the property on that date.

[5]     Mr. Fanning testified that Mr. James gave him a tour of the Heath Road Property in January of 2020 and agreed to an interview both at the property and then later by telephone. Defense counsel explained that Mr. James had been willing to testify at the hearing originally scheduled for March of

A large RV sat at the entrance of the clearing, blocking access from the path to the clearing itself. Further into the property, within the clearing, there was a white van and beyond that was a small, dilapidated camper (the "**camper**"). Spilling out of the camper and strewn about the clearing were personal belongings, most of which belonged to the Defendant. The camper had no kitchen or electrical service, instead relying on a generator. In front of the camper, there was a make-shift outdoor kitchen with a bench, cooler, and cooking utensils. A bit farther away, there was a fire pit, which was likely used to keep warm and cook meals. A woodpile sat approximately twenty yards from the camper. Mr. James told Mr. Fanning that the Defendant used a portable outdoor shower bag in the woods just beyond the clearing.

When the four officers arrived at the Heath Road Property on May 15, 2019, they parked their vehicles along the public road and walked down the dirt path, past the RV, and into the clearing. It was "pitch black out," and Corporal Schmidt testified that, while they "occasionally used a little bit of light," they did not use their flashlights much as they walked up. They noticed some "fresher" tire tracks on the path. As they approached the clearing, they observed that lights were on in the camper and a generator was running. There were no other lights illuminating the clearing.

---

2020, but during the delay caused by the pandemic, she lost touch with Mr. James and was unable to locate him to participate in the video hearing that was held in late January and February of 2021.

As they approached the camper, one of the officers turned off the generator, and the lights went out inside.[6] Trooper Walton knocked on the door of the camper, and a woman answered. Until that point, officers had not seen or heard any other individuals on the property that night. The woman identified herself as Myranda Mitchell,[7] and she stepped out of the camper to speak to the officers. As she did, she noticed that the generator had been switched to the "off" position. She provided the officers with accurate identification information. The officers ran a license check on Ms. Mitchell and determined that she had no outstanding warrants. Ms. Mitchell informed the officers that Mr. James was letting her stay at the property but that he was not there that night. She further explained that she had not seen Mr. James for a couple of weeks. Corporal Schmidt testified that Ms. Mitchell's pupils appeared to be constricted, and she confirmed that she had used an opiate that day. She told the officers that she had been preparing to go to sleep.[8]

---

[6]    Corporal Schmidt stated that the lights were on in the camper when the officers approached, but he said nothing about the lights going out or whether they were ever turned back on. Trooper Dubois testified that, as the officers approached the camper, somebody turned off the generator, but he could not recall who. Trooper Dubois did not indicate that he was surprised that the generator went off and the lights went out, or that the sudden darkening of the only light in the clearing startled him. If the officers had not been the ones to turn off the generator, presumably the officers would have considered it a sign that someone else was at the Heath Road Property. But not even Corporal Schmidt—who emphasized his "gut feeling" that someone might be hiding—suggested such concern. From these facts, I infer that one of the officers must have turned off the generator. There was no testimony about why the generator was turned off.

[7]    Ms. Mitchell did not testify at the hearing. According to defense counsel, Ms. Mitchell was willing to testify, but she was difficult to reach. A few weeks prior to the hearing, Ms. Mitchell told defense counsel that she was currently homeless and did not have her own phone to join the video hearing. Defense counsel called Hilary Billings—the attorney who originally represented Mr. Fortier but has since retired—to testify about a conversation that he had with Ms. Mitchell. The Government offered no objection to Mr. Billings's testimony.

[8]    Ms. Mitchell told Mr. Billings that she had seen four police vehicles on Heath Road at approximately 8:30 p.m. that evening. She observed that one of the police vehicles had pulled into the

Corporal Schmidt asked Ms. Mitchell if anyone else was on the property. She responded that her stepbrother—whom she identified as "Conor Tibbetts"—had been there but had left forty-five minutes earlier after the two got into an argument. Ms. Mitchell recalled telling the officers that they needed a warrant to search the property[9] and the officers responding that they were just there to do a bail check on Mr. James.

Ms. Mitchell acquiesced to officers looking for Mr. James in the camper she was occupying. They went in, according to Ms. Mitchell, and looked around the camper with their flashlights, but they did not find him.[10] Ms. Mitchell indicated that she was asked whether she would show the officers around the clearing, but she stated that she was not comfortable doing that.

While Corporal Schmidt was speaking with Ms. Mitchell, the other officers began looking around the clearing. When Corporal Schmidt finished speaking with Ms. Mitchell, he joined the search, and Trooper Dubois remained at the camper with Ms. Mitchell. At some point, someone entered the white van and removed a motorbike found inside. Officers also examined two dirt bikes and a street bike near the white van and checked their VIN numbers through their dispatcher. At another point, an

---

driveway of a neighboring property and shined its high beams towards the clearing at the Heath Road Property.

[9]     Corporal Schmidt was not asked whether Ms. Mitchell said anything about a warrant, and Trooper Dubois testified that he did not recall Ms. Mitchell saying anything about a warrant.

[10]     Neither Corporal Schmidt nor Trooper Dubois could recall if Ms. Mitchell let officers look in the camper, but Trooper Dubois did testify that he was able to see into the camper from the doorway. The camper was small enough that officers likely would have been able to see a person without having to step into the camper.

officer located a shotgun on the ground near the bikes and determined it was loaded. None of the witnesses recalled how many minutes into the encounter the shotgun was discovered. A fifth officer—Trooper Travis Doughty—arrived midway through the search.

Corporal Schmidt repeatedly testified that he had a "gut feeling that someone else was nearby" and that Ms. Mitchell "was not being entirely truthful," a feeling that intensified after the loaded shotgun was found. He stated that, based on this gut feeling, he "began to scout the area." He saw the woodpile and approached it at an angle "to come in as safe as possible." When he illuminated the back of the woodpile with his flashlight, he saw the Defendant "hunkered down" and observed that the Defendant was wearing a backpack. Corporal Schmidt drew his service weapon and told the Defendant to show his hands and stand up. When the Defendant complied, Corporal Schmidt saw an empty nylon holster on the Defendant's waistband. Corporal Schmidt asked the Defendant where the gun was and why he was behind the woodpile. The Defendant stated that the holster was for his vape[11] and that he had gone to the woodpile to take a nap. Corporal Schmidt observed that the Defendant's pupils were constricted and that he appeared to be "on the nod." Noticing a knife in the Defendant's pocket, Corporal Schmidt instructed the Defendant to put his hands on his head and asked if he could pat him down, to which the Defendant

---

[11]     Corporal Schmidt testified that, based on his training and experience, he believed that the holster was the type "that would be used for a small firearm, possibly a revolver." None of the officers tried putting the handgun—which was found near the Defendant—into the holster to see if it fit. Although a photograph of the Defendant wearing the holster was submitted into evidence, the holster itself is not in evidence because the Government did not retain it.

consented. Through the pat down, Corporal Schmidt discovered two bullets in the Defendant's pocket, which the Defendant stated he had found on the property.

At some point during this encounter, Corporal Schmidt removed the backpack from the Defendant's back. According to Corporal Schmidt, he asked the Defendant if he could remove the backpack and the Defendant consented. Corporal Schmidt testified that compartments of the backpack were unzipped and open and that he could see into the bag when it was set on the ground. Corporal Schmidt testified about what he saw:

> I saw two hypodermic needles, I saw some miscellaneous bullets. Some of them appeared to be pistol rounds; some of them appeared to be a shotgun round. And I also saw a gray style sunglass case that was partially opened, and inside that sunglass case I could clearly see a Ziploc plastic bag with a crystal-like substance that resembled that of crystal meth I have seen on a number of occasions.

Corporal Schmidt testified that he placed the Defendant under arrest after observing the "crystal-like substance" in the glasses case and that he searched the backpack after handcuffing the Defendant.[12] He subsequently discovered a handgun in the brush near where the Defendant had been. The Defendant initially identified himself as "Conor Tibbetts," and the officers located a Florida identification card bearing that name. Officers later determined that he was Richard Fortier.

Trooper Doughty's account differed a bit. Trooper Doughty was shining his flashlight on the Defendant from the front and watching Corporal Schmidt interact with the Defendant. He testified that he could see that the backpack was unzipped

---

[12]    Trooper Dubois also handcuffed Ms. Mitchell around this time.

while it was on the Defendant's back but that he could not see into the backpack as it was removed or when it was placed on the ground. He further testified that Corporal Schmidt alerted him that there were syringes in the backpack but did not say anything about the presence of drugs.[13] He did not recall whether Corporal Schmidt reached into the backpack or how the search of the backpack transpired. Based on his recollection, however, the Defendant was handcuffed after Corporal Schmidt searched the backpack.

In her conversation with Mr. Billings, Ms. Mitchell recounted the officers' interactions with Mr. Fortier differently as well. She indicated that the officers had to wake the Defendant up and that they pulled him to his feet. She explained that she heard an officer ask the Defendant if he could search the bag and that the Defendant said "no." She then stated that she observed the officer pull apart the sides of the backpack to open it and to look inside. The officers did not take any photographs of the backpack before removing the glasses case and did not retain the backpack as evidence.[14]

---

[13]     Trooper Doughty first stated that Corporal Schmidt alerted him to the presence of needles "while he was removing [the backpack]," but added that he did not "remember exactly what portion of that it was." Later, I asked him, "So [Corporal] Schmidt then takes the backpack off, sets it on the ground, and at some point thereafter begins to search through it, and then that's when you heard that there was crystal meth in there?" Trooper Doughty responded, "Yes, that is accurate."

[14]     A photograph of the backpack was submitted into evidence, but it was taken after the glasses case had been removed. Corporal Schmidt testified that he did not intend for the photograph to be an exact recreation of what the backpack looked like when he saw it on the Defendant's back. Another photograph shows the contents of the backpack on the ground, apparently placed there by the officers when they more carefully searched through the backpack. There are no photographs of the Defendant wearing the backpack or of the glasses case or drugs as they initially appeared inside the backpack.

According to the police report and officers' testimony at the hearing, officers arrived at the Heath Road Property at approximately 10:17 p.m. and conducted a license check for "Conor Tibbetts" at 11:25 p.m. At the hearing, Trooper Dubois emphasized that those times were approximate, noting that the 10:17 p.m. time stamp derived from a radio log in which officers reported that they were near the Heath Road Property.[15] Even if the time stamps were not exact, they suggest that officers were at the property for approximately an hour before they found the Defendant. No officer could recall how long officers they were on the property before they discovered the shotgun or the Defendant.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A Fourth Amendment "search" occurs "[w]hen the Government obtains information by physically intruding on persons, houses, papers, or effects." *United States v. Bain*, 874 F.3d 1, 12 (1st Cir. 2017) (alteration in original) (quoting *Florida v. Jardines*, 569 U.S. 1, 5 (2013)). A "warrantless police entry into a residence is presumptively unreasonable unless it falls within the compass of one of a few well-delineated exceptions to the Fourth Amendment's warrant requirement." *Matalon v. Hynnes*, 806 F.3d 627, 633 (1st Cir. 2015) (internal quotations omitted) (adding that "[i]t is common ground that a man's home is his castle and, as such, the

---

[15]     Trooper Dubois explained that dispatch does not always log a call at the exact time that it occurred and that sometimes officers call dispatch prior to arriving at a residence.

home is shielded by the highest level of Fourth Amendment protection"). In some circumstances, however, "such as '[w]hen faced with special law enforcement needs, diminished expectations of privacy, [or] minimal intrusions,' " the Supreme Court "has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." *Maryland v. King*, 569 U.S. 435, 447 (2013) (first alteration in original) (quoting *Illinois v. McArthur*, 531 U.S. 326, 330 (2001)). This includes cases where an individual is "on notice" due to "conditions of his release from government custody," and thus the need for a warrant is "diminish[ed]." *Id.* (citing *Samson v. California*, 547 U.S. 843 (2006)). But even where a warrant is not required, a search must still be reasonable in its scope and manner of execution. *Id.* at 448. Reasonableness is assessed by examining the totality of the circumstances, *see Samson*, 547 U.S. at 848, and by weighing "the promotion of legitimate governmental interests against the degree to which [the search] intrudes upon an individual's privacy," *King*, 569 U.S. at 448 (alteration in original) (internal quotations omitted). The Government bears the burden of proving that a warrantless search was reasonable. *Bain*, 874 F.3d at 17.

Under the exclusionary rule, physical evidence obtained during or as a direct result of an unlawful invasion may be excluded from trial. *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). This is a "prudential doctrine," and its purpose "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011) (internal quotations omitted); *see also United States v. Sparks*, 711 F.3d 58, 63 (1st Cir. 2013). In assessing whether the exclusionary rule is applicable, "the operative

inquiry is whether 'the interest protected by the constitutional guarantee that has been violated would . . . be served by suppression of the evidence obtained.' " *United States v. Cruz-Mercedes*, 945 F.3d 569, 575 (1st Cir. 2019) (alteration in original) (quoting *Strieff*, 136 S. Ct. at 2061).

## DISCUSSION

The Defendant has moved to suppress all evidence seized from the encounter at the Heath Road Property. He argues that the officers violated his Fourth Amendment rights by entering the property without a warrant and continuing to search the property after being informed that Mr. James was not present. He also disputes that the contents of the backpack were in plain view.

## I.   Defendant's Reasonable Expectation of Privacy

As a threshold manner, the Government contends that the Defendant lacks standing to challenge any intrusion onto the Heath Road Property. Fourth Amendment rights are personal to each defendant and cannot be asserted vicariously. *See United States v. Padilla*, 508 U.S. 77, 81–82 (1993); *United States v. Beauregard*, 2:18-cr-00192-JAW, 2019 WL 2619530, at *3 (D. Me. June 26, 2019). "[T]he defendant carries the burden of making a threshold showing that he has a 'reasonable expectation of privacy in the area searched and in relation to the items seized.' " *United States v. Stokes*, 829 F.3d 47, 51 (1st Cir. 2016) (quoting *United States v. Aguirre*, 839 F.2d 854, 856 (1st Cir. 1988)). As part of that test, a defendant must show that he has an actual expectation of privacy that society recognizes as legitimate. *Vega–Rodriguez v. P.R. Tel. Co.*, 110 F.3d 174, 178 (1st Cir. 1997); *see also*

*United States v. Vilches-Navarrete*, 523 F.3d 1, 13 (1st Cir. 2008) (explaining defendant has standing when he has both "a subjective expectation of privacy" in the place to be searched, and "society accepts that expectation as objectively reasonable" (citing *California v. Greenwood*, 486 U.S. 35, 39 (1988))). In assessing whether a defendant has a legitimate expectation of privacy, the First Circuit considers the following factors:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case.

*United States v. Almeida*, 748 F.3d 41, 47 (1st Cir. 2014) (quoting *Aguirre*, 839 F.2d at 856–57); *United States v. Deschambault*, No. 2:19-cr-00187-JAW-1, 2020 WL 5637659, at *11 (D. Me. Sept. 21, 2020).

The Supreme Court has held that a defendant's status as an overnight guest represents "a longstanding social custom that serves functions recognized as valuable by society" and is sufficient to show that he had a legitimate expectation of privacy. *Minnesota v. Olson*, 495 U.S. 91, 98 (1990); *see also Bain*, 874 F.3d at 13–14 (rejecting argument that only one who could maintain a trespass claim in property could raise a trespassory Fourth Amendment violation and concluding that overnight guest could challenge such a violation). In contrast, visits that are brief or commercial in nature do not garner the same status. *See Minnesota v. Carter*, 525 U.S. 83, 86, 89–91 (1998) (defendants lacked privacy interest in property they occupied for a short time for sole purpose of packaging cocaine); *United States v. Larios*, 593 F.3d 82, 94–95 (1st Cir.

2010) (defendant lacked privacy interest in motel room in which he spent only a few minutes and did not stay overnight).

In this case, the facts establish that Mr. Fortier was an overnight guest at the Heath Road Property. According to Mr. Fanning, Mr. James told the Defendant that he could "live on the property just to get away from everything." Mr. James also stated that the Defendant had been staying in the camper periodically, including for as long as two weeks at a time; that most of the belongings in front of the camper belonged to the Defendant; and that the Defendant rigged up a makeshift shower in the woods. This testimony meshed with Ms. Mitchell's account that Mr. James gave permission for both the Defendant and her to stay in the camper, and it was corroborated by the fact that the Defendant appeared to have been staying at the property on the night of May 15, 2019, at least up until the time he quarreled with Ms. Mitchell.[16] Courts have held that even intermittent overnight guests can have an expectation of privacy. *See United States v. Brown*, 322 F. Supp. 2d 101, 106 n.8 (D. Mass. 2004), *aff'd*, 510 F.3d 57 (1st Cir. 2007) (citing cases) ("A guest, whether in long-term residence, or simply an overnight visitor, has a legitimate expectation of privacy in at least that part of the premises to which he is granted access by his host."). And I find it relevant

---

[16] At the hearing, the Government emphasized that the Defendant had offered no evidence that he personally participated in arranging the clearing as an extension of the camper. However, this point blurs two questions: whether the Defendant has established that he had a privacy interest in the property—which can be afforded to mere overnight guests—and whether the clearing was so intimately related to the camper that it should enjoy the same Fourth Amendment protections as the camper itself. As to the first question, the Defendant's degree of participation in arranging the clearing is irrelevant to establishing whether he was an overnight guest (and thus had an expectation of privacy). And the second question, which is discussed more below, can be answered affirmatively regardless of whether it was the Defendant or another individual who designed and used the clearing as an extension of the camper.

that Mr. James was letting the Defendant stay at the property even when he was not present, which suggests that the Defendant was more than a visitor to Mr. James or to the property. Taken together, these facts indicate a "degree of acceptance [of the Defendant] into the household." *Larios*, 593 F.3d at 93 (quoting *Carter*, 525 U.S. at 90–91).

Still, the Government contends that the Defendant has not met his burden of showing that he has standing because the Defendant relies on out-of-court statements from Mr. James, who did not appear as a witness. It is true that much of the evidence on the standing question was second-hand and was thus less helpful than direct testimony from Mr. James would have been. But Mr. Fanning was a credible witness; he is a former police officer who has extensive experience interviewing witnesses and assessing witness reliability. Mr. Fanning testified that Mr. James seemed "honest" and "forthcoming" with him, and I credit his assessment of Mr. James's statements. I conclude that the Defendant was an overnight guest at the Heath Road Property and that he thus has standing to challenge invasions of the Heath Road Property in which he held a reasonable expectation of privacy—that is, the camper and its curtilage.[17]

---

[17]     In a somewhat underdeveloped argument, the Government seems to contend that, even if the Defendant had a privacy interest in the *place* searched, he has not shown that he had an expectation of privacy in all of the items seized, particularly the handgun. Gov't's Resp. in Opp'n to Def.'s Mots. to Suppress ("**Gov't's Opp'n**") 5–6 (ECF No. 45). Citing *United States v. Gomez*, 770 F.2d 251 (1st Cir. 1985), the Government thus argues that the Defendant does not have standing to challenge the seizure of the handgun. However, the procedural posture and facts in *Gomez* were quite different. In that case, the district court denied the defendant's motion to suppress for lack of standing because the defendant had stipulated that he did not reside at the property and offered no other evidence to show that he had a reasonable expectation of privacy in the place searched. *Gomez*, 770 F.2d at 252. The defendant then tried to object to the evidence at trial after the prosecution argued that he was in control of the property and thus had constructive control of the cocaine seized within it. *Id*. The First Circuit held that the

## II.     Search of the Heath Road Property

Having determined that the Defendant has standing to contest the search of the Heath Road Property, I next consider whether the search violated the Fourth Amendment. The Government contends that the clearing and, in particular, the side of the woodpile where the Defendant was found did not fall within the curtilage of the camper and thus were not protected by the Fourth Amendment. I address this threshold question first, before turning to whether the intrusion was reasonable.

### A.     Curtilage

"The Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." *Jardines*, 569 U.S. at 6 (quoting *Oliver v. United States*, 466 U.S. 170, 176 (1984)). Given this enumeration, the Supreme Court "has long recognized a distinction between open fields, which are not subject to Fourth Amendment protection, and the curtilage surrounding a home, which is." *Copp v. Shane*, 2:18-cv-00181-JAW, 2018 WL 6440878, at *18 (D. Me. Dec. 7, 2018) (citing *Hester v. United States*, 265 U.S. 57, 59 (1924) and *Jardines*, 568 U.S. at 7); *see also United States v. Mumme*, 985 F.3d 25, 39 (1st Cir. 2021) (explaining that, as long as the "reasonable-expectation-of-privacy

---

district court did not abuse its discretion in declining to reconsider the suppression motion at trial and concluded that the defendant failed to prove a legitimate expectation of privacy. *See id.* at 254–55 (noting that the defendant stated he lived elsewhere and that there was no evidence that he had the authority to exclude others or had a subjective expectation of privacy). Here, I have concluded that the Defendant had a reasonable expectation of privacy in the Heath Road Property, and below I conclude that the Defendant was within the curtilage when he was discovered by the officers. The handgun was found in the same "immediate area" as the Defendant, also within the curtilage. There was no testimony that the Defendant disavowed any ownership or privacy interest in the handgun when it was found. *See United States v. McCurdy*, 480 F. Supp. 2d 380, 390–91 (D. Me. 2007). Considering all of these facts, I find that the Defendant also had a reasonable expectation of privacy in the handgun sufficient to challenge its seizure.

test" is met, an officer may gather information from "open fields" because such fields are not enumerated in the Fourth Amendment). Thus, even though the Defendant's status as an overnight guest confers a privacy interest in the camper sufficient for standing, that privacy interest extends only to the camper (i.e., the Defendant's "home" while he stayed at the Heath Road Property) and the curtilage—"[t]he area immediately surrounding and associated with the home." *Jardines,* 569 U.S. at 6 (internal quotations omitted) (explaining that the curtilage "enjoys protection as part of the home itself").

Courts generally utilize four factors—the *Dunn* factors—to determine whether a location falls within a home's curtilage. These factors are:

1. "[T]he proximity of the area claimed to be curtilage to the home,"
2. "[W]hether the area is included within an enclosure surrounding the home,"
3. "[T]he nature of the uses to which the area is put, and"
4. "[T]he steps taken by the resident to protect the area from observation by people passing by."

*United States v. Brown*, 510 F.3d 57, 64–65 (1st Cir. 2007) (quoting *United States v. Diehl*, 276 F.3d 32, 38 (1st Cir. 2002)). Although "these factors are useful analytical tools," the guiding question is whether the location is "so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Dunn*, 480 U.S. 294, 301 (1987).

Applying the *Dunn* factors to the facts of this case, I conclude that the clearing and the woodpile fall within the curtilage of the camper. No witness recalled the size of the whole clearing, but Corporal Schmidt testified that the woodpile was

approximately twenty yards from the camper, with no trees or other barriers between them. This distance is relatively short, especially given the rural setting of the Heath Road Property. *See Diehl*, 276 F.3d at 39 (concluding that distance of eighty-two feet was not determinative and noting that the curtilage in a rural setting can be more expansive than in an urban one); *United States v. Reilly*, 76 F.3d 1271, 1277 (2d Cir. 1996) (explaining that a distance of 375 feet from the main residence did not preclude finding that cottage was within curtilage, particularly given the rural setting); *Hart v. Myers*, 183 F. Supp. 2d 512, 522–23 (D. Conn. 2002) (concluding that a distance of twenty-five yards from the home was "fairly short" and could support an inference that the area was within the curtilage, especially given the "camp-like setting," where "more of the activities intimately associated with the home [would] likely be conducted" outside).

As for the second factor, although there was no artificial enclosure such as a fence surrounding the clearing, trees were cleared to delineate a relatively defined area. In rural areas, "natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.' " *United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001) (en banc) (plurality opinion) (quoting *Dunn*, 480 U.S. at 302); *see also United States v. Hayes*, 551 F.3d 138, 148–49 (2d Cir. 2008) (in finding that area was not within curtilage, considering it relevant that there was no evidence that defendant had created or tended to vegetation barrier or otherwise intended for it to serve as boundary). At the Heath Road Property, trees were cleared to create a livable space but, notably, many trees were left to enclose it.

19

And the last two factors strongly support finding that the area was part of the curtilage. In many ways, the clearing was treated as an extension of the home or an "outdoor room." *See United States v. Conrad*, 578 F. Supp. 2d 1016, 1028 (N.D. Ill. 2008) (deck, which was used for eating and treated as an "outdoor room" of the house, fell within the curtilage). The kitchen utensils and fire pit indicate that the area was used for cooking, which has been recognized as "an intimate family activity."[18] *See, e.g.*, *United States v. Garrott*, 745 F. Supp. 2d 1206, 1212 (M.D. Ala. 2010); *United States v. Alexander*, 888 F.3d 628, 633–34 (2d Cir. 2018) (driveway area that defendant occasionally used for recreation and barbeques and where he sometimes used his grill constituted curtilage); *Widgren v. Maple Grove Twp.*, 429 F.3d 575, 582 (6th Cir. 2005) (concluding that presence of picnic table, fire pit, and pruned trees indicated that cleared area surrounding house was used for "the activities and privacies of domestic life" (internal quotations omitted)). Moreover, the clearing was set far back from the public road—approximately 100 yards—and was not visible to passersby. *See United States v. Jenkins*, 124 F.3d 768, 773 (6th Cir. 1997) (wooded area surrounding house and yard "protect[ed] against undesired public viewing of the backyard"). And, again, the Heath Road Property was in a rural setting, where it is often unnecessary to build a barrier to further obscure views. *See id.* ("It is also important to remember that defendants live in a remote and sparsely populated rural

---

[18] The Government emphasizes that there was no first-hand testimony from witnesses who observed anyone using the clearing for personal activities. But photographs depicting the placement of kitchen items in front of the camper and the rustic nature of the camper itself—it had no kitchen inside—support a reasonable inference that the clearing was used as an extension of the indoor living space.

area where they would have had no particular reason to believe that they needed to construct a high impenetrable fence around the backyard in order to ensure their privacy.").

Even if the clearing falls within the curtilage of the camper, the Government makes the point that the Defendant was located on the opposite side of the woodpile, away from the camper, and asserts that this was beyond the curtilage. I find this distinction unconvincing. Given that the Defendant was found next to the woodpile, he could not have been much more than twenty yards from the camper. There is no indication that the Defendant's location was visible from the public road. He was next to wood presumably stored for use at the firepit, tying the woodpile to the intimate activities discussed above. And I disagree with the Government's characterization of the woodpile as a "boundary of [the] clearing" and thus the boundary of the curtilage. The woodpile was not a fence that delineated the boundary of the clearing; the clearing was delineated by trees. The woodpile, which was within that tree line, was simply one part of the clearing. Moreover, testimony at the hearing indicated that the Defendant used areas beyond the clearing and behind the woodpile to shower, an obviously intimate and private activity. Based on these facts, I conclude that the Defendant was within the curtilage of the camper when he was discovered and that the officers were in the curtilage when they were in the clearing.

### B.    Mr. James's Bail Conditions

Because I have concluded that the Defendant had a reasonable expectation of privacy in the clearing of the Heath Road Property and that he was found within the curtilage of the camper, I next assess the reasonableness of the officers' intrusion. I

begin by considering the reasonableness of the officers' initial entry into the clearing, and then turn to their continued presence and search of the property.

The Government contends that the officers lawfully entered the Heath Road Property to conduct a bail check on Mr. James. As noted, Mr. James had agreed to bail conditions for his state drug charge that prohibited him from using or possessing illegal drugs and subjected him, his residence, and his vehicle to search at any time, without suspicion or probable cause, to determine his compliance with that prohibition. The Government asserts that Mr. James's agreement to these conditions constituted consent to searches of the Heath Road Property.[19]

Consent to a search is one of the exceptions to the warrant requirement. *See United States v. Jones*, 523 F.3d 31, 37 (1st Cir. 2008). When consent is used to circumvent the warrant requirement, the Government bears the burden of proving "valid, voluntary consent."[20] *Pagán-González v. Moreno*, 919 F.3d 582, 591 (1st Cir.

---

[19]    The Government also argued in its opposition to the motion to suppress and briefly at the hearing that officers had an implied license to enter the Heath Road Property. Gov't's Opp'n 6–7. The First Circuit has recognized that "[a]ll persons, whether law enforcement agents or private citizens, have an implied license to enter property and knock on a homeowner's door." *United States v. Smith*, 919 F.3d 1, 10 n.6 (1st Cir. 2019) (citing *Kentucky v. King*, 563 U.S. 452, 469 (2011)). But such a license has its limits. For example, both the majority and the dissenting opinions in *Florida v. Jardines* agreed that the implied license has temporal limits. *See* 569 U.S. 1, 18–20 (2013) (Alito, J., dissenting) (noting that the license "has certain spatial and temporal limits" and that a visitor generally may not "come to the front door in the middle of the night without an express invitation"); *id.* at 9 n.3 (majority op.) (noting that "the dissent quite rightly relies upon" the notion that a person would be alarmed by middle-of-the-night intrusions "to justify its no-night-visits rule"). Given this limit, I am doubtful that officers had a license to enter the Heath Road Property as late as they did. However, the implied license is also limited in scope. "[T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search." *Id.* at 9. Here, the Government acknowledges that, even if the officers had a license to enter the Heath Road Property, that license did not automatically authorize them to remain on the property and that the length of time they were permitted to remain on the property would be dictated by the circumstances.

[20]    Because the Defendant has a reasonable expectation of privacy in the curtilage of the camper, he can contest the validity of the consent given by another person. *See United States v. Hamilton*, Crim. No. 11-10133-RWZ, 2013 WL 4759654, at *4, *6–8 (D. Mass. Sept. 4, 2013) (overnight guest had

2019); *see also Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[W]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority."). The Government also has the burden of proving that the search was within the scope of the consent. *United States v. Turner*, 169 F.3d 84, 87 n.3 (1st Cir. 1999). "Warrantless searches may not exceed the scope of the consent given," and the "scope of consent is measured by a test of objective reasonableness." *United States v. Marshall*, 348 F.3d 281, 286 (1st Cir. 2003) (citing *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Courts "therefore look beyond the language of the consent itself, to the overall context." *Id.* (internal quotations omitted).

In this case, the only asserted source of consent was Mr. James's bail conditions. Because Mr. James was the apparent owner of the Heath Road Property,[21] the officers could rely on valid consent from him to justify their search of the property. *See United States v. Floyd*, 740 F.3d 22, 34 n.5 (1st Cir. 2014) ("A homeowner's voluntary consent to an entry into his home obviates the need for a warrant."). This is true even though Mr. James had invited the Defendant and Ms. Mitchell to stay at

---

standing to challenge search of apartment, including contesting voluntariness of consent given by person renting apartment), *aff'd*, 819 F.3d 503 (1st Cir. 2016).

[21]    Although Mr. James was not currently residing at the Heath Road Property, the facts indicate that his aunt had purchased the property for his use, he was storing some of his belongings there, and he had authority over it.

the property.[22] *See United States v. Jiménez*, 419 F.3d 34, 40 (1st Cir. 2005) (holding that property lessee could consent to search areas over which she had common authority, regardless of overnight guest's usage). The key question is whether Mr. James actually consented to searches of the Heath Road Property by agreeing to the bail conditions.

On first glance, the bail conditions do not appear to provide the necessary consent. The First Circuit has stated that it sees no reason not to "give the plain language of such a bail condition force and effect." *United States v. Gates*, 709 F.3d 58, 64 (1st Cir. 2013). The plain language of Mr. James's bail conditions authorizes searches of Mr. James's "person," "vehicle," and "residence"—identified as a property in New Hampshire. The bail conditions do not mention the Heath Road Property, and they do not state that all property owned by him is subject to search. *See United States v. Ped*, 943 F.3d 427, 430–31 (9th Cir. 2019) ("[A] parolee's diminished expectation of privacy cannot justif[y] the entry into and search of a third person's house to search for the parolee. To protect the interests of third parties, officers must have probable cause to believe that the parolee is a resident of the house to be searched." (first alteration in original) (internal quotations and citations omitted)).

Although the plain meaning of the bail conditions suggests that Mr. James did not consent to a search of the Heath Road Property, I must also consider the overall context. This involves assessing whether it was reasonable for the officers to believe

---

[22]     Mr. James could consent to searches of the areas of the property that he maintained authority over—either sole authority or common authority. For the purposes of this motion, such areas would likely include the curtilage of the camper but would likely not include the Defendant's backpack.

that the Heath Road Property was Mr. James's residence and, if not, whether it was reasonable to believe that he would be there on May 15, 2019, in order to conduct a search of his person or vehicle. According to the Government, the officers' belief that Mr. James "resided on the property was objectively reasonable" because at least one of the officers "had encountered [him] at the property on a previous occasion" and he "had previously indicated . . . that he was the owner of the property." Gov't's Resp. in Opp'n to Def.'s Mots. to Suppress ("**Gov't's Opp'n**") 10–11 (ECF No. 45). But several facts elucidated at the hearing suggest a contrary conclusion. Although Corporal Schmidt testified that he "believed" Mr. James would be there, he also conceded that he "had no knowledge that Tim James would be on the property" on the night in question.[23] Corporal Schmidt did encounter Mr. James at the Heath Road Property in June of 2018, but in the intervening months, he had not seen Mr. James there, despite at least two prior bail check attempts when he encountered nobody. Moreover, on the bail conditions form, which was executed in November of 2018, Mr. James affirmatively identified his residence as a property in Epsom, New Hampshire. The officers were aware of this fact, but they made no effort to determine if Mr. James was at the Epsom residence before going to the Heath Road Property after 10:00 p.m. on May 15, 2019.

---

[23]    Corporal Schmidt explained that sometimes individuals "are not always entirely truthful" in providing their addresses on bail condition forms or "sometimes they are not getting mail at the address that they are staying at, so they provide a different address where they can get mail." But neither Corporal Schmidt nor the Government provided any basis for concluding that Mr. James had been dishonest about his true residence, particularly given Corporal Schmidt's inability to locate Mr. James at the Heath Road Property at prior bail checks.

These facts, taken together, fall short of other cases where courts concluded that officers reasonably believed that an individual was residing at a property. *See, e.g.*, *Ped*, 943 F.3d at 431–32 (finding it reasonable for officers to believe parolee lived at family's home, despite staleness of information, because that was the address he provided on probation form, probation officer had given that address to police, nothing about that address indicated that it was transitory, and officers had previously confirmed with another resident that he lived there). They also fall short of cases where officers reasonably believed that an individual would be present. *See, e.g.*, *United States v. James*, Docket no. 2:17-CR-156-GZS, 2018 WL 2027084, at *3, *7 (D. Me. May 1, 2018) (explaining that, even though bail form listed different address for defendant, officers had reason to believe he would be at apartment because of statements made by witnesses, the defendant's own prior statements a few months earlier, and information provided by building owner that defendant was currently living there); *see also United States v. Young*, 835 F.3d 13, 21 (1st Cir. 2016) (holding that officers could not reasonably believe defendant would be at third party's apartment, despite tip from a non-anonymous source, knowledge that the defendant had previously lived with the third party, and the fact that officers had eliminated three other places where the defendant might have been found).

The purpose of requiring a warrant to enter and search a home is to ensure that a neutral and detached magistrate has made an independent determination that evidence will be found, "instead of . . . the officer engaged in the often competitive enterprise of ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14 (1948);

*see also Birchfield v. North Dakota*, 136 S. Ct. 2160, 2181 (2016). Here, the officers did not rely on a neutral magistrate but rather on their own personal determination that Mr. James might be at the Heath Road Property. This is especially troublesome because the officers' determination appears to have been unsupported by objective facts. *See Steagald v. United States*, 451 U.S. 204, 213 (1981) ("[W]e have consistently held that such judicially untested determinations are not reliable enough to justify . . . a search of a home for objects in the absence of a search warrant.").

In *Steagald*, the Supreme Court expressed concern for potential abuse if police officers were permitted to decide on their own whether there was justification for searching the home of a third party for the subject of an arrest warrant. *See id.* at 215 ("Armed solely with an arrest warrant for a single person, the police could search all the homes of that individual's friends and acquaintances."). I have similar concerns about what transpired here. Accepting the Government's argument could subject numerous properties owned or visited by an individual to searches based merely on a hunch that the individual might be there. In the process, it would undermine the privacy rights of other individuals residing at those locations. I thus conclude that the officers did not have Mr. James's consent to enter and search the Heath Road Property under the circumstances of this case. Mr. James had not designated this property as his residence that would be subject to searches, and because there was no objective reason to believe that Mr. James would be there that night, the bail conditions did not authorize any entry to search for Mr. James. Without consent or a warrant, the officers' entry into the curtilage of the Heath Road

27

Property was an unconstitutional search, and all evidence discovered subsequent to that unlawful entry should be suppressed. *See Young*, 835 F.3d at 23.

### C.   Continued Search of Heath Road Property

Even if it were reasonable for the officers to enter the Heath Road Property and knock on the door of the camper to look for Mr. James, the Government would need to show that the officers' continued presence and expansive search of the clearing was also reasonable. Again, in assessing the reasonableness of the search, I must weigh, "on the one hand, the degree to which [the search] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *United States v. Knights*, 534 U.S. 112, 118–19 (2001) (quoting *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999)).

Here, the officers' lengthy, probing search of the Heath Road Property, late at night, after being told that Mr. James was not present, was intrusive and exploratory. Neither the officers nor the Government has articulated any concern about public safety that would have prompted or explained the search. The only stated purpose of the search was to look for Mr. James and to check whether he was complying with his bail condition that prohibited the possession or use of illegal drugs. There was no evidence that Mr. James had ever violated his conditions. And Mr. James had not yet been convicted of the misdemeanor offense with which he was charged. *See United States v. Scott*, 450 F.3d 863, 873–74 (9th Cir. 2006) (distinguishing pretrial releasee from probationer in *Knights*); *cf. Knights*, 534 U.S. at 120–21 (noting heightened governmental concern about probationers committing crimes).

The Government suggests a few possible theories for why the search was reasonable. First, the Government argues that, because officers had "reasonable grounds to believe that [Mr. James] resided at the camper, they were permitted to search the camper and its curtilage for evidence of illegal drugs, and to search for [Mr. James] on the premises." Gov't's Opp'n 11. But, as discussed above, the facts do not support any inference that the Heath Road Property was Mr. James's "residence" in May of 2019. Moreover, even assuming that the officers had some limited authority to enter the property to look for Mr. James in order to conduct a search of his "person," the search became increasingly unreasonable when Ms. Mitchell—not Mr. James—answered the door and told the officers that Mr. James was not there and she had not seen him for weeks. The Government's argument—that the officers had the authority to scour the property for Mr. James or for drugs—stretches the scope of the bail conditions beyond reasonable interpretation. And I find it especially concerning that the search lasted approximately an hour and was so investigatory that it included examining VIN numbers on bikes. That is not merely a quick search for a specific person, and it exceeds the scope of consent obtained through the bail conditions, which merely authorized searches to determine if Mr. James was using or possessing illegal drugs.

Second, the Government seems to argue that the officers' continued presence was justified by "evolving circumstances and what they learned throughout the night." In other words, after their interaction with Ms. Mitchell—who appeared to be under the influence of drugs—and the discovery of the shotgun, it was reasonable to

search the property to see if Mr. James was present. The problem with this theory is that there was still no objective reason to believe that Mr. James was present. In fact, there was even *less* of a reason to believe he was there because they had just been told he was not. Any sort of hunch that Ms. Mitchell was lying[24] or a "gut feeling" that some person—not even necessarily Mr. James—was present cannot be enough to justify an hour-long, probing search of private property. The Supreme Court has instructed that such hunches are insufficient for any sort of reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (explaining that an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch" ' of criminal activity" in order to establish reasonable suspicion (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

The Government's argument appears even more untenable from a broader view. If the Government's theory is accepted, police officers could rely on stale information that an individual had been at a location months earlier to justify a warrantless entry and a probing search, despite statements from others on-site that the sought-after individual was not present. Any prior residence or property owned by a person bound by similar bail conditions could be subject to entry and exhaustive search—even if the person had not listed the property as a residence—just because

---

[24]     The Government suggests that it was reasonable for officers to think that Ms. Mitchell was covering for Mr. James and to think that Mr. James had fled to evade the officers. Ms. Mitchell had so far provided accurate information. And to the extent that she seemed nervous, it was most likely attributable to the fact that four male police officers had come to the camper at 10:30 p.m., shut off the generator leaving her in the dark, and questioned her about her own drug use. The officers had seen no one moving around in the woods as they approached. And I find it unconvincing that someone who was fleeing the police in a rural, wooded area would stop just at the edge of a clearing. Neither common sense nor the objective facts from that night support such an inference.

officers had encountered him there nearly a year before. And those living at the property could do little to prevent the privacy invasion. This is a relinquishment of privacy rights not contemplated by the bail conditions that Mr. James signed, nor envisioned by the guests he let stay at his property.

Next, although not raised by the Government in its opposition, the officers suggested at the hearing that they searched the property out of concern for officer safety. Corporal Schmidt testified that once the shotgun was discovered, he became concerned about officer safety and had a "gut feeling" that someone else was present at the Heath Road Property. As a result, he began "scout[ing]" the clearing.

The Supreme Court has recognized that officers can justifiably conduct a "protective sweep" of an area "to protect the safety of police officers or others" at the scene. *Maryland v. Buie*, 494 U.S. 325, 327 (1990). A protective sweep is " 'a quick and limited search of premises,' usually incident to an arrest, that is . . . 'narrowly confined to a cursory visual inspection of those places in which a person might be hiding.' " *United States v. Hernandez-Mieses*, 931 F.3d 134, 141 (1st Cir. 2019) (quoting *Buie*, 494 U.S. at 327). To justify a protective sweep, officers must have a "reasonable suspicion of danger," meaning "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* (quoting *Buie*, 494 U.S. at 334). " '[A] mere inchoate and unparticularized suspicion or hunch' that someone

31

is hiding who could pose a danger to the arresting officers is not enough to support a protective sweep." *Id.* (alteration in original) (quoting *Buie*, 494 U.S. at 332).

In this case, any purported sweep was both unjustified and excessive. Officers had not seen anyone else on the property as they approached, and Ms. Mitchell had told them that "Conor Tibbetts" had left forty-five minutes earlier. By their own admission, the officers searched the clearing based on a "gut feeling" that someone else might be present. That is not enough. *See Pena v. Porter*, 316 F. App'x 303, 315–16 (4th Cir. 2009) (concluding that officers failed to articulate specific facts demonstrating a reasonable fear for safety where they acted on a hunch and merely identified items that suggested that people had recently left the property); *Johnson*, 256 F.3d at 905–06.

Even more problematic, what officers engaged in here did not resemble a protective sweep. It was not quick or cursory. In fact, it lasted approximately an hour and included VIN checks on motorcycles that were lying around and found in the van.[25] This stands in stark contrast to other cases where protective sweeps were found to be lawful. *See Hernandez-Mieses*, 931 F.3d at 142–43 (collecting cases involving protective sweeps that lasted a few minutes); *cf. Buie*, 494 U.S. at 335–36 (explaining that a protective sweep must "last[ ] no longer than is necessary to dispel

---

[25]    The Government has conceded that none of the testimony at the hearing established how much time elapsed between the officers' arrival and their discovery of the shotgun. Had the shotgun been observed immediately upon the officers' arrival, they perhaps could have been justified in conducting a short protective sweep. But the testimony at the hearing indicates that all four officers went to the camper first and that they did not begin searching around the clearing until after the discussion with Ms. Mitchell. This suggests that the shotgun was found after officers had been informed that Mr. James was not present. Thus, the Government has not met its burden of showing that the warrantless search was reasonable.

the reasonable suspicion of danger"). And the nature of the officers' search of the clearing belies any argument that it was merely a protective sweep. Although the officers may have been justified in a quick sweep of the camper and a quick glance around the clearing for Mr. James, the investigatory "scout[ing]" by officers far exceeded that. The Government identifies no case in which comparable police actions were found to be reasonable.

Finally, the subsequent discovery of evidence cannot be justified by other theories. At the hearing, much of the testimony centered on whether the contents of the Defendant's backpack were in plain view when the officer removed the backpack from the Defendant's back. But a "plain-view seizure . . . cannot be justified if it is effectuated by unlawful trespass." *Collins v. Virginia*, 138 S. Ct. 1663, 1672 (2018) (internal quotations omitted). Thus, for the plain view doctrine to be available, officers must have been lawfully in the place from which they observed the incriminating items.[26] *See United States v. Gamache*, 792 F.3d 194, 199 (1st Cir.

---

[26]     I also have doubts about whether the illegal nature of the contents of the backpack was plainly visible to Corporal Schmidt, without him manipulating the backpack in some way. Corporal Schmidt testified that "things [were] shuffled around in the backpack" when it was moved, prior to any photograph being taken of its contents. More fundamentally, my ability to assess whether the contents could have been visible is limited by the officers' own actions. Corporal Schmidt initially would not allow the glasses case to be removed from the brown evidence bag in which it was contained because he was concerned it might contain residue from the drugs. Accordingly, defense counsel had been unable to see or handle the glasses case before the first day of the hearing. After I asked whether it would be appropriate for me to draw an adverse inference against the Government for its decision not to provide access to the glasses case, an agreement was reached whereby Corporal Schmidt opened the evidence bag under controlled conditions in order to videotape his handling of it. The case itself was not admitted into evidence. On the video, the glasses case shut by itself leaving only a small opening. Corporal Schmidt indicated that the case was open approximately an inch when he observed it in the backpack. As defense counsel argued, the backpack was heavily weighed down with the ammunition that was at its bottom. Whether it would have been possible for the glasses case to remain open in a weighted bag is hard to determine. The officers did not take a photograph of what the backpack looked like before they removed the glasses case, and the backpack itself was not retained to aid in recreating the conditions. Even the Government conceded that the demonstration video did not "really get us any closer to whether it would have been possible or impossible for this glasses case to be open or shut."

2015) (explaining that the plain view doctrine authorizes a warrantless seizure "if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself"). The evidence shows that the discovery of the Defendant came well into the unlawful search of the clearing—approximately an hour after the officers arrived at the property. Based on this timeline, the officers had already exceeded the scope of any reasonable search and were not lawfully present when they found the Defendant and the contents of the backpack.

Likewise, the Government cannot rely on the inevitable discovery doctrine to argue that the evidence should be admissible. That doctrine holds that "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . the evidence should be received." *United States v. Soto-Peguero*, 978 F.3d 13, 20 (1st Cir. 2020) (alterations in original) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). But for the inevitable discovery doctrine to be applicable, the lawful means of discovery must be independent from the Fourth Amendment violation, the discovery must have truly been inevitable, and the application of the doctrine in this particular context must "not sully the prophylaxis of the Fourth Amendment." *Id.* at 17 (quoting *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994)). Here, absent the officers' unlawful entry, extension of their stay, or "scouting" of the clearing, there is little reason to conclude

---

Given this state of the evidence, I conclude that the Government similarly did not meet its burden in proving that the drugs in the backpack were plainly visible.

that they would have discovered the Defendant, his backpack, or the obscured handgun.[27]

"The touchstone of the Fourth Amendment is reasonableness . . . ." *Knights*, 534 U.S. at 118. Given the facts of this case, I conclude that the officers' search of the Heath Road Property was unreasonable and thus unconstitutional.

## CONCLUSION

For the reasons stated above, the Court **GRANTS** the Defendant's motion to suppress all evidence obtained against him through the search of the Heath Road Property.

SO ORDERED.

/s/ Nancy Torresen
United States District Judge

Dated this 16th day of March, 2021.

---

[27] For similar reasons, the Government's brief assertion that the evidence would have been discovered in a search incident to arrest is unpersuasive. The Government argues that, "[b]ecause the defendant was arrested based on probable cause to believe he possessed illegal drugs, the backpack would have inevitably been subject to an inventory search at the police barracks." Gov't's Opp'n 16–17. Setting aside the fact that the officers relied on the contents of the backpack to support probable cause in the first place, there is no evidence suggesting that the officers would have arrested the Defendant had they not engaged in an unlawful search.